

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-30-2002

# Pinker v. Roche Holdings Ltd

Precedential or Non-Precedential: Precedential

Docket No. 00-4318

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Pinker v. Roche Holdings Ltd" (2002). *2002 Decisions.* Paper 313.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/313

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 30, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-4318 and 01-1562

HAROLD PINKER, individually and on behalf of all others
similarly situtated

v.

ROCHE HOLDINGS LTD.

Harold Pinker, Appellant

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 99-cv-05627)
District Judge: Honorable John W. Bissell, Chief Judge

Argued: November 7, 2001

Before: BECKER, Chief Judge, McKEE and RENDELL,
Circuit Judges.

(Filed: May 30, 2002)


JEFFREY H. SQUIRE, ESQUIRE
IRA M. PRESS, ESQUIRE (ARGUED)
MARK A. STRAUSS, ESQUIRE
LEWIS S. SANDLER, ESQUIRE
Kirby, McInerney & Squire LLP
830 Third Avenue
New York, NY 10022

MICHAEL M. ROSENBAUM,
 ESQUIRE
Budd, Larner, Gross & Rosenbaum
150 John F. Kennedy Parkway
CN 1000
Short Hills, NJ 07078

Counsel for Plaintiff-Appellant

LAWRENCE J. PORTNOY, ESQUIRE
 (ARGUED)
GWENN M. KALOW, ESQUIRE
MANISHA M. SHETH, ESQUIRE
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

MICHAEL R. GRIFFINGER, ESQUIRE
THOMAS VALEN, ESQUIRE

          Gibbons, Del Deo, Dolan,
           Griffinger & Vecchione
          One Riverfront Plaza
          Newark, NJ 07102

          Counsel for Defendant-Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

American Depositary Receipts ("ADRs") are financial
instruments that allow investors in the United States to
purchase and sell stock in foreign corporations in a simpler
and more secure manner than trading in the underlying
security in a foreign market. Harold Pinker, the plaintiff in
this putative securities fraud class action, invested in ADRs

                          2

of the defendant, Roche Holdings Ltd. ("Roche"), a Swiss
corporation with its principal place of business in
Switzerland. The gravamen of Pinker's action is that he
purchased Roche ADRs at a price that was artificially
inflated due to the company's misrepresentations about the
competitiveness of the vitamin market when in fact its
subsidiaries were engaged in a worldwide conspiracy to fix
vitamin prices. As the truth about Roche's collusive activity
began to emerge, Pinker alleges, the price of Roche ADRs
dropped, and Pinker and other similarly situated investors
suffered a loss. As a result, Pinker claims, Roche is liable
for securities fraud in violation of Section 10(b) of the
Securities Exchange Act, 15 U.S.C. S 78j(b), and Rule 10b-
5, 17 C.F.R. S 240.10b-5, promulgated thereunder by the
Securities and Exchange Commission ("SEC").

The District Court dismissed Pinker's complaint under
both Fed. R. Civ. P. 12(b)(2) (for lack of personal
jurisdiction) and Fed. R. Civ. P. 12(b)(6) (for failure to
adequately plead reliance). In reviewing the District Court's
dismissal of Pinker's complaint under Fed. R. Civ. P.
12(b)(2), we examine the extent of Roche's contacts with the
United States as a whole. We think that by sponsoring
ADRs that are actively traded by American investors, Roche
purposely availed itself of the American securities market
and thereby evidenced the requisite minimum contacts with
the United States to support the exercise of personal
jurisdiction by a federal court. Moreover, in light of the fact
that Roche is alleged to have made affirmative
misrepresentations that misled its ADR holders, we
consider the exercise of personal jurisdiction over Roche
consistent with "traditional notions of fair play and
substantial justice." Int'l Shoe Co. v. Washington, 326 U.S.
310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457,
463 (1940)). Consequently, we conclude that the District
Court had in personam jurisdiction over Roche and that
dismissal under Rule 12(b)(2) was inappropriate.

We also think that dismissal was improper under Rule

12(b)(6), for we are satisfied that Pinker's complaint adequately pled the reliance element of a securities fraud claim. Pinker's potential weak spot is that his complaint reflected that at the time he purchased the Roche ADRs, he

was aware of a private antitrust lawsuit that had been brought against the company alleging vitamin price fixing. But the complaint also alleges that additional, more damning information about Roche's involvement in a price-fixing conspiracy came to light after Pinker's purchase of the ADRs -- specifically, the fact that Roche pled guilty to criminal antitrust charges. Although the market price of Roche ADRs may have begun to adjust for Roche's anti-competitive activity before Pinker's purchase, the complaint alleges facts from which it can be inferred that the market further adjusted for Roche's anti-competitive activity after Pinker's purchase. Pinker, therefore, has alleged sufficient facts to demonstrate that he reasonably relied on Roche's misrepresentations about the competitiveness of the vitamin market.

I. Facts and Procedural History

A. The Allegations of Pinker's Complaint

Roche is a Swiss holding company that conducts its operations through a network of subsidiary corporations. These subsidiaries manufacture and sell, among other things, pharmaceuticals, fragrances, vitamins, and chemicals throughout the world. Pinker alleges that Roche, acting in concert with its subsidiaries, entered into a worldwide conspiracy with certain competitors in the early 1990s to fix prices and allocate market share for bulk vitamins. Pinker's complaint alleges that at the same time it was engaging in this conspiracy, Roche made material misrepresentations and misleading statements indicating that the vitamin market was competitive. Pinker's complaint points to press releases and annual and semi-annual reports issued by Roche in which it described the competition in the vitamin market as, among other things, "fiercely" and "highly" competitive. In the face of this supposed competition, Pinker avers, Roche's statements portrayed it as a company succeeding and excelling through superior business practices when, in fact, its financial success was due to its participation in a collusive scheme.

Pinker alleges that Roche sponsored an ADR facility in the United States in 1992, and that during the class period

the over-the-counter market for Roche ADRs, which had a daily trading volume of 25,000, "was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and

reflected such information in Roche's stock price."
Consequently, Pinker contends, Roche committed a fraud
on the market through its misrepresentations about the
competitiveness of the vitamin market, causing him to pay
an artificially inflated price for his Roche ADRs when he
purchased them on April 27, 1999. Before Pinker
purchased ADRs in Roche, on March 12, 1999, a
Minneapolis law firm announced its filing of a class action
antitrust lawsuit against Roche and eight other companies
in which it alleged a conspiracy to fix prices and set
volumes in the United States vitamin market. Although
Pinker acknowledges that this announcement had the effect
of causing Roche's ADR price to decline, he argues that the
price declined further after the full extent of Roche's anti-
competitive activity became known on May 20, 1999. On
that date, Pinker alleges, Roche announced that it had
reached a settlement with the U.S. Department of Justice
under which it and a former company executive agreed to
plead guilty to conspiracy to fix prices and allocate market
share and Roche agreed to pay a record $500 million fine
for its wrongdoing.

B. American Depositary Receipts (ADRs)

Because the role of ADRs is so central to our analysis of
personal jurisdiction, we think it important to describe
their operation in some detail. ADRs were created in 1927
to assist American investors who wanted to invest
internationally, but were reluctant to do so due to
regulatory and currency exchange difficulties. See Melissa
Wilverding, Depository Receipts, II Global View (Brown
Brothers Harriman), 2001, at 3. They also offered
significant benefits to foreign companies, allowing them to
tap into the American capital market. See id.  They have
since become one of the preferred methods for trading
foreign securities in the United States, with the value of
ADRs bought and sold annually in the hundreds of billions.
See Bruce L. Hertz, American Depository Receipts, 600
P.L.I./Comm. 237, 239 (1992).

5

An ADR is a receipt that is issued by a depositary bank
that represents a specified amount of a foreign security that
has been deposited with a foreign branch or agent of the
depositary, known as the custodian. Id. at 240-41. The
holder of an ADR is not the title owner of the underlying
shares; the title owner of the underlying shares is either the
depositary, the custodian, or their agent. Id.  at 241. ADRs
are tradeable in the same manner as any other registered
American security, may be listed on any of the major
exchanges in the United States or traded over the counter,
and are subject to the Securities Act and the Exchange Act.
Id. at 242, 246. This makes trading an ADR simpler and
more secure for American investors than trading in the
underlying security in the foreign market. Id.  at 240.

ADRs may be either sponsored or unsponsored. An
unsponsored ADR is established with little or no

involvement of the issuer of the underlying security. A sponsored ADR, in contrast, is established with the active participation of the issuer of the underlying security. Id. at 242-43. An issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners. Id. at 243. The agreement establishes the terms of the ADRs and the rights and obligations of the parties, such as the ADR holders' voting rights. Id.

SEC Form F-6 governs the registration of ADRs. Form F-6 requires that the registrant disclose important information related to the issuance of the ADR, including the terms of the depositary agreement (if any), material contracts between the depositary and the issuer, and an opinion of counsel regarding the legality of the ADRs. Id. at 288. Moreover, Form F-6 mandates that the registrant provide in its prospectus a description of the ADRs being registered, including information about fees and charges imposed on the ADR holder. Id. at 286-87. ADRs that are traded on American securities exchanges must abide by the Exchange Act's periodic reporting requirements. Id. at 288-89. ADRs that are not traded on exchanges, such as Roche's, are not subject to the Exchange Act's reporting requirements, but under SEC Rule 12g3-2(b) the issuer must furnish such annual reports, shareholder communications, and other materials that are required to

6

be prepared pursuant to regulations in its home country. See id. at 289-90 (citing 17 C.F.R. S 240.12g3-2(b)).

Pursuant to these requirements, Roche filed a Form F-6 registration statement in June 1992 to register 100 million ADRs, and has since filed its annual and semi-annual reports with the SEC in compliance with Rule 12g3-2(b). It is through these annual and semi-annual reports, as well as through press releases, that Pinker alleges that Roche communicated to the investing public its misrepresentations about the competitiveness of the vitamin market from 1996 to 1999.

C. Procedural History

Pinker commenced this securities fraud action in the District Court for the District of New Jersey seeking to represent a class of purchasers of Roche ADRs during the period of December 3, 1996 through May 20, 1999-- the date on which Roche allegedly entered a plea agreement with the Justice Department admitting its participation in the price-fixing conspiracy. The District Court entered an order granting Pinker's motion to be appointed lead plaintiff. The record does not reflect any action concerning class certification. As noted above, the Court granted Roche's motion to dismiss Pinker's complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), or, in the alternative, for failure to state a claim under Fed. R. Civ. P. 12(b)(6), and Pinker now appeals.

Pinker also appeals the District Court's denial of his motion to amend the original complaint pursuant to Fed. R. Civ. P. 15(a), or in the alternative to amend the District Court's order of dismissal pursuant to Fed. R. Civ. P. 59(e) and 60(b). Because we ultimately conclude that plaintiff's original complaint should not have been dismissed, we need not address these issues.

## II. Personal Jurisdiction

We review a district court's decision with respect to personal jurisdiction de novo. See Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 200 (3d Cir. 1998). Although the plaintiff bears the burden of demonstrating

the facts that establish personal jurisdiction, see Mellon Bank (East) PSFS Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992), in reviewing a motion to dismiss under Rule 12(b)(2), we "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

## A. Background

In determining whether a court may exercise personal jurisdiction we examine the relationship among the defendant, the forum, and the litigation. See Max Daetwyler Corp. v. Meyer, 762 F.2d 290, 293 (3d Cir. 1985). Here, where the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum, the court is said to exercise "specific jurisdiction." IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998) (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall , 466 U.S. 408, 414 n.8 (1984)).1 In federal court, the exercise of specific jurisdiction must satisfy the requirements of the Due Process Clause of the Fifth Amendment. See In re Real Estate Title & Settlement Servs. Antitrust Litig. , 869 F.2d 760, 766 n.6 (3d Cir. 1989). In particular, specific jurisdiction may be exercised only when the defendant has constitutionally sufficient "minimum contacts" with the forum, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (quoting Int'l Shoe, 326 U.S. at 316), and where subjecting the defendant to the court's jurisdiction comports with "traditional notions of fair play and

_____

1. "Specific jurisdiction" stands in contrast to "general jurisdiction," which is established when a defendant's contacts with the forum are "continuous and systematic." Int'l Shoe , 326 U.S. at 317. If general jurisdiction exists, the contacts between the defendant and the forum need not be specifically related to the underlying cause of action in order for an exercise of personal jurisdiction over the defendant to be proper. See, e.g., Provident Nat'l Bank v. Calif. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 438 (3d Cir. 1987). Although Pinker argues that the District Court had general jurisdiction over Roche, we consider his specific jurisdiction argument much stronger (and ultimately meritorious for the purposes of

this appeal) and therefore do not address whether Roche is subject to general jurisdiction.

substantial justice." Int'l Shoe, 326 U.S. at 316 (quoting Milliken, 311 U.S. at 463).

In a case such as this, where the plaintiff's claim is based on a federal statute authorizing nationwide service of process, see Section 27 of the 1934 Securities Act, 15 U.S.C. S 78aa, this Court has suggested in dicta that the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole. For instance, in Max Daetwyler, we recognized "[t]he constitutional validity of national contacts as a jurisdictional base" where a statute "provide[s] for nationwide service of process or service wherever defendant is 'doing business' or'may be found.' " 762 F.2d at 294 n.3 (citations omitted). We considered the aggregation of the national contacts of an alien defendant "neither unfair nor unreasonable" under the Fifth Amendment in light of the fact that a federal court sits as a unit of the national government and, therefore, the territorial limitations that apply to the exercise of state court jurisdiction -- or, for that matter, federal jurisdiction in diversity cases, see IMO Indus., 155 F.3d at 258-59 -- are inapposite. Max Daetwyler, 762 F.2d at 294.

Where Congress has spoken by authorizing nationwide service of process, therefore, as it has in the Securities Act, the jurisdiction of a federal court need not be confined by the defendant's contacts with the state in which the federal court sits. See DeJames v. Magnificence Carriers, Inc., 654 F.2d 280, 284 (3d Cir. 1981). Following this reasoning, the district courts within this Circuit have repeatedly held that a "national contacts analysis" is appropriate"when appraising personal jurisdiction in a case arising under a federal statute that contains a nationwide service of process provision." AlliedSignal, Inc. v. Blue Cross of Calif., 924 F. Supp. 34, 36 (D.N.J. 1996); see also Green v. William Mason & Co., 996 F. Supp. 394, 396 (D.N.J. 1998) ("[A]n assessment of personal jurisdiction under [a statutory provision authorizing nationwide service of process] necessitates an inquiry into the defendant's contacts with the national forum."). We too are persuaded by the reasoning of our prior decisions on the subject, and, consistent with several of our sister courts of appeals, hold that a federal court's personal jurisdiction may be assessed

on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process. See Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 946-47 (11th Cir. 1997); Busch v. Buchman, Buchman & O'Brien Law Firm, 11 F.3d 1255, 1258 (5th Cir. 1994); United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1330 (6th Cir.

1993); United Elec., Radio & Mach. Workers of Am. v. 163
Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1992);
Sec. Investor Protection Corp. v. Vigman, 764 F.2d 1309,
1316 (9th Cir. 1985), rev'd on other grounds, Holmes v. Sec.
Investor Protection Corp., 503 U.S. 258 (1992); see also
Autoscribe Corp. v. Goldman & Steinberg, Inc., 1995 U.S.
App. LEXIS 2848, at *7 (4th Cir. Feb. 3, 1995) (per curiam)
(not precedential) (citing Hogue v. Milodon Engineering, Inc.,
736 F.2d 989, 991 (4th Cir. 1984)).

We have reasoned that in assessing the sufficiency of a
defendant's contacts with the forum, a court should look at
the extent to which the defendant "availed himself of the
privileges of American law and the extent to which he could
reasonably anticipate being involved in litigation in the
United States." Max Daetwyler, 762 F.2d at 295; see also
Hanson v. Denckla, 357 U.S. 235, 253 (1958) (requiring
"that there be some act by which the defendant
purposefully avails itself of the privilege of conducting
activities within the forum State, thus invoking the benefits
and protections of its laws"). In assessing whether a
commercial entity has availed itself of the privileges of a
forum's laws, jurisdiction is proper if the defendant has
taken "action . . . purposefully directed toward the forum
State." Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.,
480 U.S. 102, 112 (1987) (plurality opinion of O'Connor,
J.).

Once minimum contacts have been established, we
assess whether the exercise of personal jurisdiction is
consistent with "traditional notions of fair play and
substantial justice." Int'l Shoe, 326 U.S. at 316 (citation
omitted).2 In the context of state courts, the Supreme Court

_____

2. To be sure, there has been some debate as to whether this second
prong of the International Shoe analysis ought to apply in the context of

10

has stated that this inquiry requires evaluating"the burden
on the defendant, the forum State's interest in adjudicating
the dispute, the plaintiff's interest in obtaining convenient
and effective relief, the interstate judicial system's interest
in obtaining the most effective resolution of controversies,
and the shared interests of the several States in furthering
fundamental substantive social policies." Burger King, 471
U.S. at 477 (internal quotation marks omitted). In the
federal court context, the inquiry will be slightly different,
taking less account of federalism concerns, see Max
Daetwyler, 762 F.2d at 294 n.4, and focusing more on the
national interest in furthering the policies of the law(s)
under which the plaintiff is suing.

_____

a federal statute authorizing nationwide service of process. Compare,
e.g., Vigman, 764 F.2d at 1315-16 (requiring only minimum contacts),
with Republic of Panama, 119 F.3d at 945 (requiring that the
"constitutional notions of fairness and reasonableness" be met) (internal

quotation marks omitted). This Court has not issued an authoritative ruling on the matter, although we have hinted that a fairness analysis consisting of more than an assessment of the defendant's national contacts would be appropriate. See In re Real Estate, 869 F.2d at 766 n.6 (citing Oxford First Corp. v. PNC Liquidating Corp., 372 F. Supp. 191, 203-05 (E.D. Pa. 1974)). Because the plaintiff has not objected to the application of a "fair play and substantial justice" analysis, we will assume, without deciding, that such an analysis is appropriate in this context.

It is important to note that the application of a"fair play and substantial justice" test has generated the most controversy in cases in which a defendant has contested the jurisdiction of the particular district court in which he was being sued in addition to, or rather than, his contacts with the nation as a whole, on the basis that the forum was a particularly unfair one. See, e.g., Republic of Panama, supra; Oxford First Corp., supra. Here, by contrast, Roche does not contend that being sued in the District of New Jersey is any more unfair than being sued anywhere else in the United States. Rather, its argument focuses on its lack of sufficient contacts with the United States as a whole. Consequently, our assessment of the "fair play and substantial justice" prong need not concern itself with the propriety of litigating this action in the District Court of New Jersey vis-a-vis other district courts throughout the nation. Cf. Max Daetwyler, 762 F.2d at 294 & n.5 ("[A]n alien defendant's preference for a particular state as a more or less convenient forum generally [should not] rise to the level of a constitutional objection.").

11

B. Discussion

Pinker's complaint alleges that Roche sponsored an ADR facility in the United States in 1992; that these ADRs "were actively traded on the over the counter market;" and that "the average daily trading volume of Roche ADRs during the Class Period was about 25,000 ADRs." To be precise, the complaint alleges that Roche "established" an ADR facility, not that it "sponsored" such a facility. Roche, however, conceded before the District Court that its ADR program was sponsored, a fact which is confirmed by its public filings. The complaint also alleges, as noted above, that Roche made a series of fraudulent statements in various reports and media releases that had the effect of artificially inflating its ADR price. Although the complaint does not specify to whom the press releases were addressed, it does allege that the releases "were carried by national newswires," and that "Roche's ADRs were followed by analysts from major brokerages, including CIBC World Markets, Merrill Lynch, Salomon Smith Barney, Argus Research, Schroder & Co., Inc., and Lehmann [sic] Brothers."

Mindful of our obligation to "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff," Carteret Sav. Bank, 954 F.2d at 142 n.1, we view these alleged facts as sufficient to support personal jurisdiction over Roche. In our view, by sponsoring an ADR facility, Roche "purposefully avail[ed] itself of the privilege of

conducting activities" in the American securities market, and thereby established the requisite minimum contacts with the United States. Hanson, 357 U.S. at 253. As discussed above, sponsored ADRs such as Roche's require the issuer to deposit shares with an American branch of a depositary and to enter a deposit agreement with the ADR holders defining the rights of ADR holders and the corresponding duties of the issuer. By sponsoring an ADR, therefore, Roche took affirmative steps purposefully directed at the American investing public.3 The aim of

---

3. Although the plaintiff's complaint does not explain in detail what an ADR is and how an ADR facility is established, we believe that these facts may be judicially noticed. See Fed. R. Evid. 201(b).

12

sponsoring an ADR, after all, is to allow American investors to trade equities of a foreign corporation domestically. Roche, therefore, clearly took "action" -- sponsoring an ADR in a deliberate attempt to solicit American capital -- "purposefully directed toward the [United States]." Asahi Metal Indus., 480 U.S. at 112.

Roche's sponsorship amounted to an active marketing of its equity interests to American investors. Just as solicitation of business in the forum state is generally sufficient to establish personal jurisdiction over the defendant for claims arising out of injuries to purchasers within the forum state, see, e.g., McGee v. Int'l Life Ins. Co., 355 U.S. 220 (1957) (upholding personal jurisdiction over a defendant who solicited in the forum state a reinsurance agreement that formed the basis for plaintiff's breach of contract claim), so too is personal jurisdiction appropriate where a foreign corporation has directly solicited investment from the American market. A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market. Although the plaintiff's complaint does not allege that the fraudulent media releases and annual reports were specifically directed to American investors, a foreign corporation that has created an American market for its securities can fairly expect that that market will rely on reports and media releases issued by the corporation.

Roche argues that the exercise of personal jurisdiction in this case is inappropriate because its ADRs were not listed on any American exchanges. This factor, Roche contends, distinguishes this case from others in which federal courts have found the issuers of ADRs to be subject to personal jurisdiction. See, e.g., Itoba Ltd. v. LEP Group PLC, 54 F.3d 118, 120 (2d Cir. 1995) (foreign issuer listed ADRs on the NASDAQ). We disagree. The mere fact that its ADRs were not listed on an American stock exchange does not demonstrate that Roche did not seek to avail itself of the American securities market, for even though Roche ADRs were not traded on an exchange, the complaint alleges that

Roche ADRs were actively traded on the over-the-counter market and that the average daily trading volume of Roche ADRs was about 25,000.

13

We also conclude that the exercise of personal jurisdiction over Roche comports with "traditional notions of fair play and substantial justice." Roche submits that because unlisted ADRs are subject only to minimal disclosure requirements under federal securities laws, it is therefore unfair to subject Roche to the disclosure requirements of S 10(b). Roche argues that it could not have been expected to know that American investors would assume that its disclosures abided by American standards or that American investors might later claim to have been defrauded under a fraud-on-the-market theory. However, even though Roche's ADRs were unlisted, they were still subject to some reporting requirements -- namely, whatever requirements Switzerland imposes. See 17 C.F.R. S 240.12g3-2(b) (requiring foreign issuers to furnish the SEC with shareholder communications and other materials as are required to be prepared pursuant to home market regulations in order to maintain exemption from the reporting requirements applicable to American companies). Moreover, while the parties have not addressed the issue, it would appear that the alleged fraudulent misstatements of Roche, being affirmative misrepresentations and not simply material omissions, would violate the disclosure requirements of any securities regulatory regime, including Switzerland's.[4]

Additionally, we believe that the national interest in furthering the policies of the American securities regulatory system militates in favor of exercising personal jurisdiction over Roche. As explained in Section I.B, ADRs are the preferred method for trading in foreign securities in the United States in part because they are a more secure

_____

4. Even if Roche is correct that the fraud-on-the-market theory is unique to American law and that, as a Swiss corporation, it could not have expected that its misrepresentations would subject it to liability under this theory, this is a problem that can be addressed by choice-of-law doctrine, for it goes to the merits of the case rather than to the question of personal jurisdiction. See Burger King, 471 U.S. at 481-82 ("[C]hoice of law analysis -- which focuses on all elements of a transaction, and not simply on the defendant's conduct -- is distinct from minimum-contacts jurisdictional analysis -- which focuses at the threshold solely on the defendant's purposeful connection to the forum.").

14

investing option for Americans than purchasing the foreign corporation's stock directly due to the fact that they are subject to reporting and regulatory requirements under the Securities Act and the Exchange Act. Allowing Roche to escape the personal jurisdiction of the federal courts would

in essence nullify the regulatory protection that American investors seek when they purchase ADRs.5   If ADRs are subject to the United States securities regulatory regime in theory, but are exempt in practice due to the inability of American courts to exercise personal jurisdiction over the foreign corporation issuer, one would expect them to be considered a less attractive option for American investors.

In sum, we do not think it unfair or inconsistent with "traditional notions of fair play and substantial justice" to subject Roche to personal jurisdiction in a United States court when it has taken affirmative steps to market its ADRs to the American investing public, and when it is alleged to have made material misrepresentations about its business practices that have artificially inflated the market price of those ADRs. We therefore conclude that the District Court erred in dismissing Pinker's complaint pursuant to Rule 12(b)(2) for failing to adequately allege personal jurisdiction.6

_____

5. We also note that without this regulatory protection, Roche and other foreign corporations might have a more difficult time obtaining American capital through ADR facilities.

6. As a holding company, Roche conducted its operations in the United States through an array of subsidiaries and sub-subsidiaries. An issue is raised in the briefs as to the extent to which the activities of these subsidiary entities are chargeable to Roche for the purposes of personal jurisdiction. We recognize that an argument can be made that the activities of Roche and these entities -- particularly, F. Hoffman-La Roche Ltd., a Swiss corporation, and the New Jersey corporations of Hoffman-La Roche, Inc., and Roche Vitamins, Inc., which, it appears, were responsible for the marketing and sale of bulk vitamins in the United States -- were so intertwined as to justify imputing the subsidiaries' conduct to Roche for personal jurisdiction purposes. In particular, although not alleged in Pinker's complaint, it could also be argued that we should judicially notice the fact that the same person, Dr. Fritz Gerber, simultaneously served as Chairman of the Board of Roche and Chairman and Chief Executive Officer of F. Hoffman-La Roche

15

III. Reliance

To state a valid claim for securities fraud underS 10(b) and Rule 10b-5, a plaintiff must allege that the defendant: (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or the sale of a security; (4) upon which the plaintiff reasonably relied; and (5) that the plaintiff's reliance was the proximate cause of his or her injury. See In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002). If a plaintiff fails to allege any of these elements, the complaint must be dismissed. See In re Westinghouse Sec. Litig. , 90 F.3d 696, 712-13 (3d Cir. 1996).

A plaintiff may prove reasonable reliance under a fraud-on-the-market theory. See Semerenko v. Cendant Corp., 223

F.3d 165, 178 (3d Cir. 2000). Under this theory, a plaintiff is entitled to a presumption of reliance if he bought securities in an efficient market; in an efficient market, the price of the security is assumed to have incorporated the alleged misrepresentations of the defendant. See id. Pinker alleges that "[a]t all relevant times, the market for Roche's ADRs was an efficient market that promptly digested current information with respect to the Company from all publicly available sources and reflected such information in Roche's stock price." In light of Roche's numerous alleged misrepresentations about the competitiveness of the vitamin market, Pinker contends that he has adequately pled reliance under a fraud-on-the-market theory because he bought Roche ADRs at a price that was artificially inflated due to the market's reliance on these misrepresentations.

The District Court concluded that Pinker had failed to plead reliance in light of the complaint's acknowledgment of

_____

Ltd. during times relevant here. We ultimately decline to delve into these complicated legal and factual issues of corporate veil-piercing, however, because we are satisfied, for the reasons set forth above, that Roche purposefully availed itself of the American market and legal system through its sponsorship of an ADR facility. Although veil-piercing issues may be relevant at the merits stage of this litigation, we do not consider it necessary to address them for the purposes of Rule 12(b)(2).

16

both Pinker's and the market's awareness of a Minneapolis law firm's public announcement of its plans to sue Roche for antitrust violations on March 12, 1999. Because Pinker did not purchase his Roche ADRs until April 27, the Court concluded that the announcement of the antitrust lawsuit had been integrated into the price of Roche ADRs and that, as a result, Pinker could not show reliance under a fraud-on-the-market theory because the market was already aware of Roche's anti-competitive activities at the time at which Pinker purchased his ADRs.

While we think that the complaint could have been more artfully drafted, in light of our responsibility at this stage to construe its allegations in the light most favorable to the plaintiff, we conclude that Pinker has adequately pled reliance.7 Although the complaint alleges that the March 12 "revelation . . . caused the share price of Roche to drop," this allegation lies within a section of the complaint entitled "The Truth Begins to Emerge." (Emphasis added). Later in the same section Pinker alleges that on May 20, 1999-- a point in time after he purchased his ADRs in Roche -- Roche and a former Roche executive agreed to plead guilty to criminal antitrust charges. These allegations make clear Pinker's assertion that although the truth about Roche's anti-competitive activities might have begun to emerge to both Pinker and the market on March 12, 1999, the full extent of Roche's illegal activities was not disclosed until May 20, 1999.

Moreover, the disclosure of a private law firm's filing of an antitrust suit against Roche hardly indicated to the market with any degree of certainty that Roche had indeed engaged in anti-competitive activity. Although the market knew that Roche would have to incur legal expenses as a result of the suit, the market may well have thought that

---

7. We exercise de novo review over dismissal of claims under Fed. R. Civ. P. 12(b)(6). See A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 249 n.25 (3d Cir. 2001). In evaluating the propriety of the dismissal, we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. See Colburn v. Upper Darby Twp., 838 F.2d 663, 665-66 (3d Cir. 1988).

17

the lawsuit was frivolous, or that at the very least Roche stood a good chance of successfully defending itself or reaching an acceptable settlement. The revelation of May 20, on the other hand, amounted to an outright admission by Roche of wrongdoing. At that point, the investing public became aware not only of Roche's illegal activity, but also that it had agreed to pay a record $500 million fine for its antitrust violations.8

In sum, reading the complaint in the light most favorable to the plaintiff, it is possible that the full truth about Roche's anti-competitive activity had not yet emerged by the time at which Pinker purchased his ADRs, and, therefore, he has adequately pled reasonable reliance under a fraud-on-the-market theory of liability.

Conclusion

Having concluded that dismissal of the plaintiff's complaint was inappropriate under both Rules 12(b)(2) and 12(b)(6), the order of the District Court dismissing the complaint will be reversed, and the case remanded for further proceedings.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

---

8. Roche points out that although Pinker's complaint alleges that "Roche agreed to plead guilty," it was actually one of Roche's subsidiaries, F. Hoffman-La Roche Ltd., that entered into the plea agreement, and Roche itself was not involved. The plea agreement filed in the Northern District of Texas does indeed reflect that only the United States government and F. Hoffman-La Roche Ltd. were parties to the agreement. However, even if, despite our obligation to accept all of the complaint's factual allegations as true, we were to agree that Pinker's allegation is a factual

mischaracterization, it is likely that Pinker has adequately pled reliance in light of the fact that the value of ADRs in Roche, a holding company, is necessarily tied to the actions and fluctuations in value of its subsidiary operating entities, including F. Hoffman-La Roche.

18