

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-6-2004

# Schmidt v. Zimmer Inc

Precedential or Non-Precedential: Precedential

Docket No. 03-3695

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Schmidt v. Zimmer Inc" (2004). *2004 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT
OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 03-3695

———————

UNITED STATES OF AMERICA
EX REL.
RICHARD G. SCHMIDT, M.D.
v.
ZIMMER, INC; MERCY HEALTH
SYSTEM, d/b/a, t/a MERCY
FITZGERALD HOSPITAL;
MERCY HOSPITAL OF
PHILADELPHIA, a/k/a/
MISERICORDIA HOSPITAL;
MERCY HAVERFORD HOSPITAL;
MERCY COMMUNITY HOSPITAL;
MERCY SUBURBAN HOSPITAL;
MERCY CATHOLIC MEDICAL
CENTER

Richard G. Schmidt,
Appellant

———————

On Appeal From the United States
District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 00-cv-01044)
District Judge: Hon. Eduardo C.
Robreno

———————

Argued April 15, 2004

BEFORE: RENDELL, STAPLETON,
and LAY,* Circuit Judges

(Opinion Filed: October 6, 2004)

———————

Richard A. Sprague
Joseph A. Podraza, Jr. (Argued)
Sprague & Sprague
135 South 19th Street
Wellington Building, Suite 400
Philadelphia, PA 19103
  and
Martin I. Twersky
H. Laddie Montague, Jr.
Berger & Montague
1622 Locust Street
Philadelphia, PA 19103
  Attorneys for Appellant

Steven L. Jackson (Argued)
Baker & Daniels
111 East Wayne Street, Suite 800
Fort Wayne, IN 46802
  and
Joan A. Yue
Reed Smith
1650 Market Street
2500 One Liberty Place
Philadelphia, PA 19103
  Attorneys for Appellee Zimmer, Inc.

———————

* Hon. Donald P. Lay, United States
Circuit Judge for the Eighth Circuit, sitting
by designation.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Richard G. Schmidt, M.D. ("Schmidt"), an orthopedic surgeon in Bala Cynwyd, Pennsylvania, brought this *qui tam* action pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, against defendant Zimmer, Inc. ("Zimmer"), a manufacturer, seller, and distributor of orthopedic implants. The District Court dismissed Schmidt's complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. We will reverse the judgment of the District Court.

## I.

In his first amended complaint, which is at issue in this appeal, Schmidt purported to allege FCA violations against both Zimmer and Mercy Health Systems ("Mercy").[1] In particular, Schmidt alleged that Zimmer entered into a contract with

---

[1]Mercy is a Pennsylvania corporation that owns and operates hospitals and other health care facilities, including Mercy Fitzgerald Hospital, Mercy Hospital of Philadelphia a/k/a Misericordia Hospital, Mercy Haverford Hospital, Mercy Community Hospital, Mercy Catholic Medical Center, and Mercy Suburban Hospital.

Premier Purchasing Partners ("Premier"), an organization which acts as a purchasing agent for a group of entities, including Mercy, that provide medical services for which reimbursement may be sought under the Medicare program ("Premier Participants"). The contract committed Zimmer to provide orthopedic implants to the Premier Participants for a period of five years.

Under this contract, the Premier Participants were rewarded if they purchased Zimmer's products in sufficient numbers to increase Zimmer's market share. Among these rewards was a "conversion incentive." This incentive was intended to compensate the Premier Participants for purchasing implants from Zimmer rather than its competitors. Under the "conversion incentive," when a Premier Participant purchased more than the total number of implants it had purchased the year before, each additional implant could be purchased for a reduced price of $200. In addition, the contract allegedly provided that each Premier Participant would receive a 2% bonus on implant purchases if the Premier Participant met the pre-set market share and volume purchase commitments. Finally, the contract allegedly provided for additional incentives "targeted to offset the costs associated with competitive conversion." Each Premier Participant would forfeit the foregoing rewards if they failed to meet the commitments pre-set by Zimmer.

Schmidt further alleged that the

rewards provided under the contract were paid to Mercy and the other Premier Participants "in cash or cash equivalents," and that these payments are a classic example of "kickbacks." Moreover, it was alleged that Zimmer and Mercy induced certain of its physicians and orthopedic departments to assist in meeting Zimmer's prescribed volume and market share levels by sharing with them all or part of the rewards received from Zimmer under the contract.

According to Schmidt, each Premier Participant reported its costs associated with the purchase of orthopedic implants in annual cost reports that were submitted to the United States Government under the Medicare program. The reporting form, United States Department of Health and Human Services's Form HCFA-2552, required a health care provider to certify that the costs being submitted were true and correct, and that the provider had complied with all laws and regulations regarding the provision of health care services.[2] Such certification,

---

[2]Specifically, Form HCFA-2552, according to the first amended complaint, provides that:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law.

Furthermore, if services identified by this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines, and/or imprisonment may result.

J.A. at 35-36. The form also requires the following certification by an officer or administrator of the health care provider:

> I hereby certify that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by . . . (Provider Name(s) and Number(s)) for the cost reporting period beginning . . . and ending . . . and that to the best of my knowledge and belief it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the

3

Schmidt alleged, was a condition precedent for Premier Participants to obtain Medicare funds from the federal government and to retain Medicare funds advanced by the federal government. Schmidt alleged that, despite these requirements, the cost reports submitted by Mercy and the other Premier Participants did not disclose the rewards that they allegedly received from Zimmer under the contract.[3] Schmidt further alleged that Mercy and the other Premier Participants also falsely certified on their cost reports that they were in compliance with all laws and regulations regarding the provision of health care services.

According to Schmidt, the remunerations paid by Zimmer to Mercy and the other Premier Participants under the contract were made in violation of the federal Anti-Kickback Act, 42 U.S.C. § 1320a-7b. In particular, Mercy was alleged to have violated § 1320a-7b(b)(1) by knowingly and wilfully soliciting or receiving such unlawful remunerations, and Zimmer was alleged to have violated § 1320a-7b(b)(2) by knowingly and wilfully paying or offering to pay such unlawful remunerations.[4] Both Mercy

---

services identified in this cost report were provided in compliance with such laws and regulations.

J.A. at 36.

[3]With the exception of Mercy, Schmidt's first amended complaint did not identify any other Premier Participant who was alleged to have filed a false Form HCFA-2552 cost report. Nor did the complaint indicate the number of cost reports that were allegedly submitted by Mercy or any other Premier Participant.

---

[4]42 U.S.C. § 1320a-7b(b) provides, in relevant part, that:

> (1) whoever knowingly and wilfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than

$25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

In addition, § 1320a-7b(b)(3) provides certain exceptions to, and safe harbors for, acts within the scope of § 1320a-7b(b)(1)

and Zimmer were alleged to have violated § 1320a-7b(a)(3) by failing to disclose to the federal government the allegedly unlawful remunerations.[5]

and (2).

[5] 42 U.S.C. § 1320a-7b(a)(3) provides, in relevant part, that:

Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any [benefit or payment under a Federal health care program (as defined in subsection (f) of this section)], or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized, . . . shall (i) in the case of such a statement, representation, concealment, failure, or conversion by any person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program,

5

Schmidt's first amended complaint also alleged that both Mercy and Zimmer violated the Anti-Self-Referral Act (also known as the "Stark Act"), 42 U.S.C. § 1395nn, by presenting, or causing to be presented, Medicare reimbursement claims for services furnished pursuant to prohibited referrals.[6] Specifically, the complaint alleged that there was a "financial relationship" between Mercy and certain physicians that worked at Mercy's facilities, and that such a relationship also existed between Mercy and Zimmer. Despite these alleged financial relationships, according to the complaint, Mercy nonetheless unlawfully sought Medicare reimbursements for services furnished under prohibited referrals.

Finally, based on these alleged violations of the Anti-Kickback Act and the Stark Act, Schmidt alleged that Mercy's certifications of compliance with federal health care law, contained in its annual cost reports submitted to the federal

---

be guilty of a felony and upon conviction thereof fined not more than $25,000 or imprisoned for not more than five years or both, or (ii) in the case of such a statement, representation, concealment, failure, conversion, or provision of counsel or assistance by any other person, be guilty of a misdemeanor and upon conviction thereof fined not more than $10,000 or imprisoned for not more than one year, or both.

[6]The Stark Act prohibits the presentation of a claim to Medicare for a designated health service by an entity where the service was furnished pursuant to a prohibited referral by a physician that has a financial relationship with the entity. *See* 42 U.S.C. § 1395nn(a). Under § 1395nn(a)(1)(A), a physician may not refer Medicare patients to an entity for "designated health services," including inpatient and outpatient hospital services, if the referring physician has a nonexempt "financial relationship" with such entity. Under § 1395nn(a)(1)(B), the entity is prohibited from presenting or causing to be presented a Medicare claim for services furnished pursuant to a prohibited referral. With certain exceptions, "financial relationship" is defined as (1) an ownership or investment interest in the entity, or (2) a compensation arrangement with the entity. 42 U.S.C. § 1395nn(a)(2). *See generally United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901-02 (5th Cir. 1997) (describing the operation of the Stark Act).

6

government on Form HCFA-2552, were false. Mercy's false certifications, according to the complaint, constituted violations of three provisions of the FCA, rendering both Mercy and Zimmer liable: (1) 31 U.S.C. § 3729(a)(1), which prohibits knowingly presenting, or causing to be presented, to an officer or employee of the United States Government a false claim for payment or approval, (2) § 3729(a)(2), which prohibits knowingly making, using and/or causing to be made or used a false record, claim, or statement to get a false claim paid or approved by the federal government, and (3) § 3729(a)(7), barring false certifications intended to conceal, avoid, or decrease an obligation to refund Medicare payments made by the federal government.

Both Mercy and Zimmer responded to the complaint by filing a motion to dismiss. Zimmer's motion to dismiss was granted with prejudice; Mercy's motion was granted without prejudice and Schmidt was allowed to file a second amended complaint against it. Ultimately, Schmidt's claim against Mercy was settled, and he filed this appeal of the order granting Zimmer's motion to dismiss.

The District Court explained its decision to dismiss Schmidt's FCA claim against Zimmer in the following manner:

> It is undisputed that Zimmer never submitted any cost reports: Zimmer could be liable under the FCA only if

it caused Mercy to submit an allegedly false cost report. But the Amended Complaint does not allege Zimmer reviewed, approved, or received copies of Mercy's cost reports or participated in their preparation; nor does it allege Zimmer certified the truthfulness of Mercy's cost reports.

> Courts have found a party caused the submission of a false claim by another party only where the non-submitting party purposely and intentionally duped the submitting party to submit the false claim.

J.A. at 6-7 (citing *United States v. Bornstein*, 423 U.S. 303 (1976)).

## II.

We exercise plenary review over the District Court's dismissal of a claim for failure to state a cause of action under Fed. R. Civ. P. 12(b)(6). *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).[7] "A court should not dismiss a

---

[7]The District Court had jurisdiction over this case under 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction for actions brought under the FCA. We have jurisdiction over

7

complaint under Rule 12(b)(6) for failure to state a claim for relief 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.'" *Pryor v. National Collegiate Athletic Ass'n*, 288 F.3d 548, 559 (3d Cir. 2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). "In evaluating the propriety of the dismissal, we accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker*, 292 F.3d at 374 n.7 (citing *Colburn v. Upper Darby Township*, 838 F.2d 663, 665-66 (3d Cir.1988)).

III.

According to Zimmer, it is apparent from the face of the first amended complaint that its marketing program did not violate the Anti-Kickback Act or the Stark Act. Because it concluded that Zimmer was not alleged to have caused the presentation of a claim, the District Court did not reach this issue, assuming without deciding that violations of those Acts had been alleged. Based on our reading of the first amended complaint, it is not clear that the alleged conduct of Zimmer passes

this appeal pursuant to 28 U.S.C. § 1291 because the District Court's Order and Stipulation of Dismissal resulted in a final decision.

muster under the Anti-Kickback and Stark Acts. We therefore conclude that these issues cannot be resolved in the context of a motion to dismiss. Accordingly, like the District Court, we assume without deciding for purposes of this appeal that Zimmer's marketing program violated both Acts.

Zimmer insists that the Anti-Kickback Act provides a safe harbor for marketing programs offering discounts to health care providers and that its program was designed to take advantage of this safe harbor. *See* 42 U.S.C. § 1320a-7b(b)(3)(A); 42 C.F.R. § 1001.952(h). When the record is fully developed, this may turn out to be the case, but the complaint alleged that the rewards given to Mercy were paid to it in "cash or cash equivalents" and this appears to be inconsistent with Zimmer's safe harbor theory. *See* 42 C.F.R. § 1001.952(h)(5)(i) ("The term discount does not include – Cash payment or cash equivalents (except that rebates as defined in [42 C.F.R. § 1001.952(h)(4)] may be in the form of a check).").

Similarly, we cannot say that it is clear from the face of the complaint that Zimmer's marketing program was consistent with the Stark Act. The marketing scheme, according to the complaint, allegedly involved both Zimmer and Mercy sharing remunerations with physicians at Mercy in order to induce these physicians to help in meeting Zimmer's prescribed volume and market share levels. In providing such help, these

physicians allegedly made "prohibited referrals" for Mercy to provide health services for which Mercy then allegedly sought Medicare reimbursement. Inasmuch as the complaint alleges a compensation arrangement, a referral for services, and a Medicare claim for those services, Zimmer's marketing scheme does not appear to be consistent with the Stark Act. *See* 42 U.S.C. § 1395nn(a); *Columbia/HCA Healthcare*, 125 F.3d at 901-02.

IV.

The FCA provides, in relevant part:

Any person who –
(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
(3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid; [or] . . .
(7) knowingly makes, uses, or causes to be made or used, a false record or

statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729(a). In this context, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).[8]

_____

[8]The term "claim" as used in the FCA is defined as including "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

9

A suit to enforce the liability thus created may be instituted in two ways:

> The United States Department of Justice may file suit to collect damages suffered as the result of fraudulent claims which cause government money to be expended from the United States Treasury. Alternatively, a private plaintiff may bring a *qui tam* action on behalf of the government to recover losses incurred because of fraudulent claims. 31 U.S.C. § 3730(b)(1). When a private plaintiff brings a *qui tam* action, the government is permitted to intervene. But the private plaintiff may continue his suit even if the government declines to intervene. 31 U.S.C. § 3730(c)(1). If the *qui tam* suit is ultimately successful, the private plaintiff, known as a relator, is entitled to up to 30% of the funds the government recovers. 31 U.S.C. § 3730(d).

*Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 181-82 (3d Cir. 2001), *cert. denied*, 536 U.S. 906 (2002). The United States declined to intervene in this case and Schmidt accordingly proceeded as a *qui tam* relator.

To establish a *prima facie* claim under 31 U.S.C. § 3729(a)(1), a plaintiff must show that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Hutchins*, 253 F.3d at 182. In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved. *See* 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.01[B], at 2-20 (2d ed. 2003) (citing *United States ex rel. Aakhus v. DynCorp, Inc.*, 136 F.3d 676, 682 (10th Cir. 1998)). Finally, a claim under § 3729(a)(7) requires a plaintiff to prove a "reverse false claim"; that is, that the defendant made or used (or caused someone else to make or use) a false record in order to avoid or decrease an obligation to the federal government. *See Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039, 1048 (10th Cir. 2004) ("Pursuant to § 3729(a)(7), Relators are required to allege that [the defendant] had an existing, legal obligation to pay or transmit money or property to the Government and that [the defendant] submitted false statements or records to conceal, avoid, or decrease that obligation." (internal quotations omitted)).[9]

_____

[9]Moreover, we have held that FCA claims must be pleaded with particularity

10

In *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), the Supreme Court explained the purpose of the provisions of the FCA extending its coverage to those who "cause [a false claim] to be presented" and to those who "conspire" to obtain payment of such claims:

> These provisions, considered together, indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.

317 U.S. at 544. This statement of purpose structures the issue for decision here: Can it fairly be said that Zimmer knowingly assisted in causing the government to pay claims which were grounded in fraud? Construing the facts alleged in the first amended complaint in a light most favorable to Schmidt, we conclude that it can.

"[A] false *certification* of compliance [with applicable law] creates liability [under the FCA] when certification is a prerequisite to obtaining a government benefit." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996); *see Columbia/HCA Healthcare*, 125 F.3d at 902 (involving alleged violations of the Anti-Kickback and Stark Acts); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999). A certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare program. *See* 42 C.F.R. § 413.24(f)(4)(iv); *Columbia/HCA Healthcare*, 125 F.3d at 902. It follows that Schmidt alleged a violation of the FCA when he alleged that *Mercy* certified its compliance with federal health care law knowing that certification to be false. The issue for resolution is thus whether, under the allegations of the complaint, Zimmer

in accordance with Fed. R. Civ. P. 9(b). *See United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.,* 149 F.3d 227, 234 (3d Cir. 1998). Here, the District Court held that Schmidt's first amended complaint did not satisfy Rule 9(b) with respect to the FCA claim against Mercy, but nonetheless expressed its belief that the defects as to particularity could be cured easily by amending the complaint to specify the precise Form HCFA-2552 cost reports that were alleged to be false. The District Court subsequently held that Schmidt's second amended complaint against Mercy was sufficient under Rule 9(b). We will therefore assume that Schmidt's first amended complaint with respect to Zimmer was similarly deficient under Rule 9(b), but that such deficiency may be cured in the same manner as was the second amended complaint. *See* Fed. R. Civ. P. 15(a) (stating that leave to amend "shall be freely given when justice so requires").

11

knowingly assisted in Mercy's false certification.

It is true, as the District Court stressed, that the amended complaint does not allege that Zimmer "reviewed, approved, or received copies of Mercy's cost reports or participated in their preparation." The case law indicates, however, that a party may assist the filing of a false claim in other ways.

In *Hess*, for example, a group of electrical contractors had devised a scheme under which they collusively bid contracts being let by municipalities and school districts that were participating in a federal program providing federal funding. 317 U.S. at 539. Claims were submitted to the government by the local sponsors and there is no indication that the electrical contractors participated in the preparation or submission of those claims. Nevertheless, because those contractors had knowingly pursued a scheme that, if successful, would ultimately result in the submission of a false claim to the government, they were held to have caused those claims to be presented.

Similarly, in *United States v. Bornstein*, 423 U.S. 303, 307 (1976), a defendant subcontractor supplied a prime contractor with falsely marked substandard electron tubes, knowing that the tubes would in turn be used in the manufacture of radio kits sold by the prime contractor to the United States. Although the precise issue in the case was the number of statutory forfeitures assessable against the subcontractor under the FCA, the subcontractor's FCA liability itself was not questioned. In fact, the Supreme Court, citing to *Hess*, noted that "[i]t is settled that the [FCA] . . . gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government." *Id.* at 309.

It does not appear from the opinion of the Court in either *Hess* or *Bornstein* that the party actually presenting the claims to the government was aware of the fraudulent conduct. This was not a matter material to the Court's analysis, however. Given the Court's view that the crucial issue was whether the defendants knowingly assisted in the presentation of false claims, the knowledge and conduct of the defendant were what mattered and the outcome did not turn on whether the actual presenters were "duped" or participated in the fraudulent scheme.[10] Accordingly, we believe the District Court erred in concluding that someone other than the actual presenter cannot be responsible under the FCA in the absence of duping.

Schmidt, like the plaintiffs in *Hess* and *Bornstein*, alleges that Zimmer created and pursued a marketing scheme that it knew would, if successful, result in the

---

[10]By way of example, we are confident that the subcontractor in *Bornstein* would have been held no less culpable under the FCA had the prime contractor known that the electron tubes were falsely marked.

submission by Mercy and others similarly situated of compliance certifications required by Medicare that Zimmer knew would be false. If this conduct and this knowledge were proven at trial, a jury could conclude that Zimmer knowingly caused Mercy's false claims to be filed.

As we have indicated, Schmidt's complaint alleges that Zimmer came up with a marketing program that it knew to be in violation of the Anti-Kickback Act and the Stark Act. The alleged targets of this scheme were health care providers that Zimmer knew to be participants in the Medicare program. The complaint avers, for example, that the purpose of the conversion incentive prescribed in the contract with Premier was intended to "influence and obtain favorable treatment from providers who participate in the Medicare program by inducing them to purchase Zimmer's products and increase Zimmer's market share for orthopedic implant hardware. . . ." JA at 38. Moreover, it is a fair inference from the alleged facts regarding Zimmer's business and knowledge of the relevant market that Medicare participation was an important, if not an essential, characteristic of the Premier Participants. If Mercy and other Premier Participants were unable to maintain their eligibility to receive Medicare funds, the purpose of Zimmer's marketing scheme – selling as many of it implants as possible to Premier Participants – would be thwarted. We further regard it as a fair inference from the facts alleged that Zimmer was aware that Premier Participants could not maintain their eligibility for Medicare participation without certifying their compliance with federal health law. Thus, when read in a light most favorable to Schmidt, one can reasonably infer from the foregoing that Zimmer must have known that Mercy could not purchase its implants, receive kickbacks, and share those kickbacks with its physicians, in the manner provided by the contract unless Mercy falsely certified itself to be in compliance with federal law.

While it is true that Mercy allegedly made its own decision to file a false certification, this is not inconsistent with a conclusion that Zimmer caused that filing. In *United States ex rel. Cantekin v. Univ. of Pittsburgh*, 192 F.3d 402, 416 (3d Cir. 1999), this Court applied ordinary causation principles from negligence law in determining responsibility under the FCA. Under those principles, the "intervention of a force which is a normal consequence of a situation created by the actor's . . . conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about." Restatement (Second) of Torts § 443.[11] Thus, assuming that a jury were to

---

[11] The fact that Mercy's alleged false certification was an unlawful act does not render it a superseding cause that absolves Zimmer from responsibility. As § 448 of the Restatement explains:

> The act of a third person in committing an intentional tort *or crime* is a

13

conclude that Zimmer's marketing scheme was a substantial factor in bringing about Mercy's filing and that Mercy's filing was a normal consequence of the situation created by that scheme, Zimmer could be found to have caused, and thus be held responsible for, that filing.[12]

We thus conclude, based on *Hess* and *Bornstein*, that Schmidt's first amended complaint, to the extent it is based on Mercy's alleged false certification of compliance with federal health care law, states a claim upon which relief can be granted, and we will remand for further proceedings.[13] In doing so, it is important to note the limits of our ruling. Schmidt alleges that Mercy did not disclose to Medicare the illegal remunerations – *i.e.*, that it made claims for more than it in fact paid Zimmer. This appears not to have been a part of Zimmer's marketing scheme and, indeed, the Premier contract expressly provides that:

> Participating Members shall disclose the specified dollar value of discounts or reductions in price under any state or federal program which provides cost or charge-based reimbursement

---

superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.*

Restatement (Second) of Torts § 448 (emphasis added).

[12]Further, as noted above, a jury finding that Zimmer "knowingly" caused the filing does not require scienter, but, rather, could be based on mere passive disregard that the jury finds to have been reckless. *See* U.S.C. § 3729(b).

---

[13]We have limited our discussion to addressing the specific ground cited by the District Court for dismissing Schmidt's FCA claim against Zimmer. Although raised by the parties, the District Court did not reach the issues of whether Schmidt may proceed against Zimmer with respect to unnamed Premier Participants that were also alleged to have filed false certifications of compliance with applicable law. It is more appropriate, we believe, to reserve this issue for the District Court's consideration on remand.

14

to such Participating Members for the Products and services covered by this Agreement in accordance with applicable regulations.

J.A. at 121.

It thus appears that Zimmer was at least aware of the possibility that Mercy might file a false claim for more than it paid Zimmer. But mere awareness that another may, or even has, chosen to make such a claim does not alone constitute "causing a false claim to be presented." *See United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932 (8th Cir. 2001). Indeed, we do not understand Schmidt's brief before us to argue that Zimmer can be held liable under the FCA for this alleged violation of that Act by Mercy. Schmidt does claim, however, that the certification of compliance with health care law is a prerequisite to entitlement to Medicare payments and that false certifications of compliance were necessary consequences of Zimmer's marketing scheme.

V.

The judgment of the District Court will be reversed, and this matter will be remanded for further proceedings consistent with this opinion.